# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

SLOAN PLEASANTS,

*Plaintiff,*

v.

TOWN OF LOUISA and ROBERT RIGSBY,

*Defendants.*

CASE NO. 3:11-cv-00032

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This action for damages by Plaintiff Sloan Pleasants ("Ms. Pleasants") against Defendants the Town of Louisa and Officer Robert Rigsby ("Rigsby") arises out of Rigsby's warrantless entry into Ms. Pleasants's apartment and his subsequent decision to place her under arrest. Ms. Pleasants brings three claims against Rigsby under 42 U.S.C. § 1983, alleging violations of the Fourth Amendment on theories of false arrest (Count I), unlawful entry (Count II), and malicious prosecution (Count III). Ms. Pleasants is suing the Town of Louisa for failure to train under § 1983 (Count IV). Finally, Virginia state law claims are alleged by Ms. Pleasants against Rigsby for malicious prosecution (Count V) and gross negligence (Count VI).

On August 8, 2011, I conducted a hearing on Defendants' motion to dismiss Ms. Pleasants's complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). Subsequently, on August 9, 2011, I issued an order taking Defendants' motion to dismiss under advisement pending the completion of limited discovery on Ms. Pleasants's unlawful entry claim. The parties have concluded this limited discovery, and the matter is before the Court on Defendants' renewed motion to dismiss. For the reasons that follow, I will grant the motion.

# I. Background

As I have noted, the parties have conducted limited discovery on Ms. Pleasants's unlawful entry claim.  However, for the purposes of deciding Defendants' motion to dismiss Ms. Pleasants's other claims under Federal Rule of Civil Procedure 12(b)(6), I must not consider facts uncovered in discovery.  Accordingly, I will consider the facts developed in the interim only for the purposes of ruling on the unlawful entry claim.

## A. Facts as Alleged in the Complaint

Ms. Pleasants is a resident of the Town of Louisa, Virginia, and Rigsby is a duly sworn police officer employed by the Louisa Police Department.  On November 1, 2009, Rigsby and Richard Pleasants ("Mr. Pleasants"), the estranged husband of Ms. Pleasants, appeared at the home of Ms. Pleasants, who subsequently ordered them to leave the premises.   Then, on December 13, 2009, Rigsby and Mr. Pleasants again appeared at the home of Ms. Pleasants.  Rigsby entered the residence of Ms. Pleasants, allegedly without consent and without just cause, and refused to leave when ordered by Ms. Pleasants.  After entering the home, Rigsby began questioning Ms. Pleasants's minor daughter, referred to herein and in the parties' briefs as "K.P."  In response to one of Rigsby's questions, K.P. stated that her mother "had slapped her on her leg where her arm was resting" and "grabbed her by her wrist and told her to take a shower."  Compl. ¶ 12.  Although Ms. Pleasants alleges that Rigsby saw no welts or other indicia of physical injury to the child, he placed Ms. Pleasants under arrest.  Rigsby handcuffed Ms. Pleasants in front of her daughter, escorted her to his police car, and placed her in a cell at the police department.   Ms. Pleasants alleges that Rigsby "had only a 'somewhat' [sic] understanding of parental disciplining" and had received only minimal training about this subject twelve and one-half years earlier at police academy training.  Compl. ¶ 15.

Rigsby obtained an arrest warrant charging Ms. Pleasants with the Class 1 misdemeanor of assault and battery against a family member pursuant to Virginia Code §18.2-57.2,[1] released K.P. to the custody of her father, and obtained an ex parte restraining order against Ms. Pleasants in order to prevent her from having contact with her daughter.  Ms. Pleasants was later released on bond and retained a lawyer to defend herself on the charge of assault and battery on a family member.   The charge against Ms. Pleasants was ultimately dismissed on motion of the Commonwealth's Attorney.  As a result of the conduct of Rigsby, Ms. Pleasants and K.P. have been receiving psychological counseling.

## B. Facts Developed During Limited Discovery

Rigsby's first encounter with Ms. Pleasants occurred on November 1, 2009,[2] after Rigsby was dispatched to meet with Mr. Pleasants at the Louisa Volunteer Fire Department, which is located on the same street as Ms. Pleasants's apartment.   Mr. Pleasants had informed the dispatcher that Ms. Pleasants was "very violent" and "poss[ibly] intoxicated," and this information was relayed to Rigsby.

After Rigsby arrived, Mr. Pleasants told him that K.P., who was with her mother, was upset and crying.  Mr. Pleasants stated that Ms. Pleasants was threatening to throw K.P.—who was eleven years old at the time—out of the house.  Mr. Pleasants informed Rigsby that Ms. Pleasants had custody, and Rigsby told Mr. Pleasants that he could not force Ms. Pleasants to release K.P.  Nevertheless, Mr. Pleasants asked Rigsby to accompany him while he endeavored to pick K.P. up.  As he told Rigsby, Mr. Pleasants had formerly been accused by Ms. Pleasants of intimidating her.  Rigsby agreed to go along in order to prevent an altercation.

---

[1] "Any person who commits an assault and battery against a family or household member is guilty of a Class 1 misdemeanor."  Va. Code § 18.2-57.2(A).

[2] According to his deposition testimony, Rigsby did not know Mr. Pleasants or Ms. Pleasants prior to November 1, 2009.

At Ms. Pleasants's apartment, Mr. Pleasants knocked on the door.  Ms. Pleasants opened the door, conversed with Mr. Pleasants, stated "she's not going," and then slammed the door shut.  Shortly thereafter, K.P., who was crying, opened the door on her own, knowing that her father was outside.  She told her mother that she wanted to leave, and ultimately K.P. left with Mr. Pleasants.  Although Mr. Pleasants did not obtain her explicit permission, Ms. Pleasants indicated through her actions that she was acquiescing to K.P.'s departure with Mr. Pleasants.  Throughout the duration of these events, Rigsby stood back, either at the end of the sidewalk or behind Mr. Pleasants, and did not communicate with Ms. Pleasants or K.P.  However, he did observe that Ms. Pleasants was upset and that she had bloodshot eyes.  At some point after this incident, Rigsby was contacted by Mr. Pleasants about an upcoming court case related to the alleged unlawful taking of K.P. on November 1, 2009.  Rigsby ended up receiving a subpoena for this court case.

On December 13, 2009, after having spent the weekend with him, K.P. called her father on the telephone.  Mr. Pleasants missed K.P.'s call initially, and attempted to call her back.  When he did, Ms. Pleasants answered, but she refused to let him speak with K.P.  Mr. Pleasants told Ms. Pleasants that he wanted to come over to check on K.P.  During their phone conversation, Mr. Pleasants could hear K.P. yelling in the background.

Rigsby was dispatched to meet with Mr. Pleasants.  As was the case on November 1, Mr. Pleasants advised the dispatcher that Ms. Pleasants "drinks," and this information was relayed to Rigsby.  Upon meeting, Mr. Pleasants told Rigsby that K.P. had been "crying and screaming" in the background during his phone conversation with Ms. Pleasants, and he requested that Rigsby conduct a welfare check on K.P.

According to Rigsby, officers in his department are routinely dispatched to conduct

4

welfare checks on a variety of citizens upon the request of concerned family members.  During

his deposition, Rigsby was asked about his concerns that night:

> Q:   Was there something that [Mr.] Pleasants told you that caused you any alarm?
> A:   That his daughter was crying and screaming in the background and that she was - - apparently wanted to talk to her father, and her mother was not letting her.
> Q:   And did that signal to you some potential for unlawful activity?
> A:   Didn't signal to me of an unlawful activity but definitely of probable cause for investigation of an alarm.

Rigsby Dep. 26:25 – 27:10.  Rigsby further testified:

> Q:   When you - - keeping in mind, then, that you were looking to do a welfare check, what were you going to be looking for?
> A:   That the child was not in distress, that the child hadn't been injured, the child was being taken care of.  The statements of the information that I received about the child crying, screaming in the background, whether the child was being hurt or had been hurt.

Rigsby Dep. 29:4–12.

When Rigsby and Mr. Pleasants arrived at Ms. Pleasants's apartment, Mr. Pleasants

knocked on the door.  When Ms. Pleasants opened the door, Rigsby was standing a couple of feet

behind Mr. Pleasants, who was standing at the doorstep.  Eventually, Rigsby stepped up to stand

beside Mr. Pleasants.

At this point, the versions of what happened next differ.  For the purpose of resolving

Defendants' renewed motion, I review facts in the light most favorable to Ms. Pleasants.

According to Ms. Pleasants, as soon as she opened the door and saw them, she told both Rigsby

and Mr. Pleasants to get off of her property.  Ms. Pleasants contends that as she began to shut the

door, Rigsby stepped in front of Mr. Pleasants and came through the door, at which point he

began questioning K.P.  Although Ms. Pleasants concedes that in addition to her telling the men

to leave, some further conversation occurred prior to Officer Rigby's entry, she maintains that

Rigby's entry preceded any attempt to question her daughter.

5

Before entering the apartment, Rigsby maintains that he glimpsed K.P., but states that she was standing approximately ten feet inside the apartment.   After entering Ms. Pleasants's apartment, Rigsby asked K.P. to come forward so that he could ask her some questions.  While maintaining the distance between herself and her mother, K.P., who was crying, came forward. Rigsby then asked K.P. what happened.   K.P. told him that her mother had hit her and had grabbed her by the wrist and pulled her out of a chair because she would not take a shower. After speaking with K.P., Rigsby advised Ms. Pleasants that he was going to place her under arrest for domestic assault on K.P.  Rigsby did not testify in his deposition that he saw any welts, bruising, blood, or other indicia of physical injury to K.P.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Legal conclusions in the guise of factual allegations, however, are not entitled to a presumption of truth.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950–51 (2009).  Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(citations and quotations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

## B. Summary Judgment

Regarding Ms. Pleasants's unlawful entry claim, when matters outside the pleadings are presented to the court, a motion to dismiss must be treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(d).  The court should grant summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

### A. 42 U.S.C. § 1983 Claims

Section 1983 permits suits for violations of civil rights in those instances in which the violator acts under color of state law. *See Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997) ("Under [ ] § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law."). While § 1983 subjects public officers performing discretionary functions to liability for the deprivation of such rights, the doctrine of qualified immunity shields them from liability for civil damages "if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Put differently, qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'" *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The Supreme Court of the United States has held that the protection afforded by qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).

When evaluating a qualified immunity claim, the district court must consider two questions: whether a constitutional right "would have been violated on the facts alleged," and "whether the right was clearly established." *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009)

(citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson*, 555 U.S. at 236).  However, it is within the court's discretion to determine which prong of the test to address first.  *Pearson*, 555 U.S. at 236; *Wernert v. Green*, 419 F. App'x 337, 340 (4th Cir. 2011).

Ms. Pleasants urges me not to consider qualified immunity with respect to Rigsby's motion to dismiss, asserting that it is an affirmative defense not properly taken into account at this stage.  However, qualified immunity is an immunity from suit, not merely a defense to liability.  *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (stating that qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation").  Therefore, courts must scrutinize and dismiss appropriate cases on qualified immunity grounds "at the earliest possible stage of a litigation" if possible.  *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987).  As the United States Court of Appeals for the Fourth Circuit has remarked,

> when a district court declines to give a qualified immunity defense a hard look at an early stage in the litigation, either pursuant to a Rule 12(b)(6) motion to dismiss or a summary judgment motion, it risks the forfeiture of some of the protections afforded by the defense because the immunity includes "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question."

*Sigman*, 161 F.3d at 786 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)).  Accordingly, I will consider Rigsby's potential entitlement to qualified immunity where relevant,[3] and with the foregoing law as a backdrop, I proceed to an analysis of Ms. Pleasants's § 1983 claims against Rigsby and the Town of Louisa.

---

[3] This Court has awarded defendants qualified immunity at the motion to dismiss stage.  *See, e.g.*, *LeSueur-Richmond Slate Corp. v. Fehrer*, 752 F. Supp. 2d 713 (W.D. Va. 2010), *aff'd*, --- F.3d ---, 2012 WL 104914 (4th Cir. Jan. 13, 2012); *Newhard v. Borders*, 649 F. Supp. 2d 440 (W.D. Va. 2009).  "[W]hile the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage,' a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'"  *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (quoting *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)).

### 1. Unlawful Entry

Ms. Pleasants alleges that Rigsby's entry into her residence "without consent or just cause" deprived her of rights protected by the Fourth Amendment.  For his part, Rigsby maintains that his warrantless entry into Ms. Pleasants's apartment was lawful and that, even if it were not, he is nonetheless entitled to qualified immunity because any right that he may have violated was not clearly established under the circumstances he confronted at the time.

At the outset, I observe that a warrantless entry into an individual's home is presumptively unreasonable.  *Payton v. New York*, 445 U.S. 573, 586 (1980).  However, this presumption is capable of being overcome.  "[B]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  For example, warrantless entry into the home is permitted in so-called "exigent circumstances."  *See Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971) ("[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show . . . the presence of 'exigent circumstances.'").  An exigent circumstance is one where "real immediate and serious consequence" could occur if the police delay action in order to obtain a warrant.  *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984).  One such relevant exigency is "the need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403.

I commence my inquiry into Rigsby's entitlement to qualified immunity by determining whether Ms. Pleasants claims the violation of a right that was clearly established under the circumstances.  *Pearson*, 555 U.S. at 236.  A right is clearly established if "the contours of the right [are] sufficiently clear," *Creighton,* 483 U.S. at 640, such that "a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right," *Bailey v.*

*Kennedy*, 349 F.3d 731, 741 (4th Cir. 2003). Thus, this question is an objective one, answered by discerning what a hypothetical, reasonable officer would have thought under the circumstances. *Milstead v. Kibler*, 243 F.3d 157, 161 (4th Cir. 2001). Rigsby's subjective motivations and beliefs are irrelevant for the purposes of testing his entitlement to qualified immunity.

In deciding whether a right was clearly established, it must be defined "at a high level of particularity." *Edwards*, 178 F.3d at 250–51. This particularity requirement is crucial, for if the question were posed too generally, virtually all plaintiffs would be able to allege the violation of a clearly established right, thus eroding the protection afforded to officers by qualified immunity. *See Creighton*, 483 U.S. at 639. Defined with particularity then, the proper question here is whether, at the time of Rigsby's actions on December 13, 2009, it was clearly established that a police officer, called to a residence for the second time in six weeks, may not enter without a warrant in order to ensure the safety of a hysterical minor whose mother was potentially intoxicated and allegedly violent.

In other words, even assuming, *arguendo*, that Rigsby actually violated Ms. Pleasants's Fourth Amendment right, the question is whether he could have "reasonably but mistakenly" concluded that exigent circumstances were present based upon the information he possessed at the time. *Creighton*, 483 U.S. at 640–41 (holding that law-enforcement officers should not be held liable if they reasonably but mistakenly determined that exigent circumstances justified their warrantless home entry). In order for an officer to be on notice that particular conduct violates a constitutional right, "it is not required that the exact conduct ha[ve] been found unconstitutional in a previous case." *Brockington v. Boykins*, 637 F.3d 503, 508 (4th Cir. 2011). Nevertheless, the law does not expect a defendant officer "to sort out conflicting decisions or to resolve subtle

or open issues." *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007).

Ultimately, after careful consideration of the relevant case law and the facts and information known to Rigsby at the time, I conclude that the right at issue in this case had not been clearly established under the circumstances in question.

On November 1, 2009, Rigsby was first exposed to the contentious dispute between Ms. Pleasants and Mr. Pleasants over the parenting of their daughter, K.P.[4]   On that day, Rigsby learned from Mr. Pleasants that Ms. Pleasants was planning to throw their daughter out of the house.   Rigsby was informed by the dispatcher that Ms. Pleasants was "very violent" and "poss[ibly] intoxicated."   When Rigsby arrived at Ms. Pleasants's apartment that evening with Mr. Pleasants, he encountered a decidedly tense situation.   While conversing with Mr. Pleasants, Ms. Pleasants suddenly slammed the front door.   Thereafter, K.P., who was crying, opened the door and asked to be allowed to leave with her father.   Throughout this episode, Rigsby observed that Ms. Pleasants was upset and that she had bloodshot eyes.   Ultimately, the situation was diffused when Ms. Pleasants allowed Mr. Pleasants to take K.P.   Although Rigsby stated in his deposition testimony that K.P. and Ms. Pleasants hugged before K.P. left, he also noted that K.P. was still crying, distressed, and upset when they did so.

These facts served as relevant background information when, six weeks later, on December 13, 2009, Rigsby was asked by Mr. Pleasants to perform a welfare check on K.P. This time, Mr. Pleasants did not simply ask Rigsby to tag along and observe his interactions with Ms. Pleasants, but rather explicitly asked for a welfare check on K.P. because he was concerned about his daughter's safety.   Moreover, Rigsby was again alerted by the dispatcher that Ms.

---

[4] It is worth reiterating that Mr. Pleasants informed Rigsby on November 1 that Ms. Pleasants had custody of K.P. Although the parties refer to a "heated custody battle," there has been no actual suggestion that Ms. Pleasants lacked custody of K.P. on November 1; rather, it seems that Mr. Pleasants and Ms. Pleasants were engaged in a dispute over the parenting of K.P that has been erroneously termed a "custody battle."

Pleasants "drinks."   Significantly, Mr. Pleasants informed Rigsby that he had heard K.P. screaming and crying in the background of a telephone conversation he had been having with Ms. Pleasants.   When Rigsby arrived at the apartment, Ms. Pleasants was upset and hostile. Although Rigsby's stated purpose in responding to Ms. Pleasants's apartment was to check on K.P.'s well-being and to ensure that she had not been hurt, Ms. Pleasants endeavored to shut the door on Rigsby.   Importantly, it is clear that at this point, K.P. was not standing at the entrance to the apartment.   Therefore, at the time that Ms. Pleasants began to shut the door, Rigsby could not observe K.P. sufficiently to determine whether she had any physical injuries.   As the door began to shut, the window available for Rigsby to ensure the safety of K.P. began to close.   And so, faced with a split-second decision, Rigsby acted.

These facts, while not perfectly analogous, are similar in important respects to those confronted by the court in *Hunsberger v. Wood*, 570 F.3d 546 (4th Cir. 2009).   In *Hunsberger*, the court determined that a police officer who entered the plaintiffs' home without a warrant had not violated the plaintiffs' constitutional rights because his entry was justified by exigent circumstances. *Id.* at 555.   In that case, the police were originally called to a house by a neighbor who, believing the residents were out of town, suspected that the house was being occupied by unauthorized intruders who might have been vandalizing or burglarizing the place. *Id.* at 549. There were several unoccupied vehicles parked outside the residence, and the police officers who responded obtained the phone numbers of the vehicles' registered owners, one of whom answered the officers' call, and informed the officers that the car belonged to his minor stepdaughter, who was supposed to be sleeping over at a different house. *Id.* at 550–51.   He further informed the officers that he did not know the residents of the home in front of which his stepdaughter's car was parked. *Id.*   The man became increasingly worried about the welfare of

his stepdaughter.  *Id.* at 551.  Under these circumstances, one of the police officers decided to enter the house to investigate whether it was being burglarized and also to ensure the well-being of the young woman who was believed to be inside.

Ultimately, the court concluded that the objective circumstances at the time of the officer's entry would have caused a reasonable officer to believe there was an exigency excusing prompt entry.  *Id.* at 555.  According to the court, there was substantial evidence to form an "'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'"  *Id.* (quoting *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)).  To be sure, part of the exigency that the police officers confronted in *Hunsberger* related to the potential harm to property that might have been taking place inside the home at the hands of would-be burglars or vandals.  Significantly, though, the court also based its conclusion that an exigency existed on the fact that a minor may have been inside the home and in danger; indeed, the court explicitly cited the stepfather's worry over her welfare.  *Id.*   In light of this decision, a reasonable officer standing in Rigsby's shoes on December 13, 2009, could have interpreted the court's holding in *Hunsberger* (issued just a few months earlier) to mean that police officers, faced with the choice between entering a home to ensure the safety of a minor or waiting to obtain a warrant, could chose the former without violating the Fourth Amendment.[5]

Moreover, the Supreme Court has acknowledged that police officers must be given a certain degree of latitude when it comes to investigating instances of domestic violence.  In *Georgia v. Randolph*, 547 U.S. 103 (2006), the Court stated that police officers may

---

[5] An inquiry into the presence of exigent circumstances as a justification for a warrantless entry is necessarily dependent on the unique facts of the case.  For that reason, the circumstances presented by a given case rarely mirror precisely the circumstances of another.  I am aware of no case in which the court has devised a comprehensive test for exigencies or a case in which the court has thoroughly catalogued the wide variety of exigencies with a great degree of specificity.

> enter a dwelling to protect a resident from domestic violence; so long as they have a good reason to believe such a threat exists, it would be silly to suggest that police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or *to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur* . . . .

*Id.* at 118 (emphasis added). While the facts in *Randolph* do not perfectly match those in the case at hand—it was a disputed consent case in which one tenant at the residence consented to police entry to search for evidence and a co-tenant objected—the Court nevertheless clearly recognized that domestic violence situations are inherently volatile and that a responding police officer should not feel so burdened by the threat of tort damages that he decline to perform his protective duty of assessing whether violence has just occurred or is about to occur. Thus, at the time of Rigsby's warrantless entry of Ms. Pleasants's apartment, a reasonable officer could have believed that *Randolph* gave him the authority, within the strictures of the Constitution, to protect a child inside a home from the threat of domestic violence.

Indeed, in Virginia, police officers are charged with heightened responsibilities with respect to domestic violence. Specifically, § 19.2-81.3 of the Virginia Code grants police officers greater authority to make warrantless arrests for domestic assault and battery offenses. The statute provides, in pertinent part, as follows:

> A. Any law-enforcement officer . . . may arrest without a warrant for an alleged violation of § 18.2-57.2 . . . regardless of whether such violation was committed in his presence, if such arrest is based on probable cause or upon personal observations or the reasonable complaint of a person who observed the alleged offense or upon personal investigation.

> B. A law-enforcement officer having probable cause to believe that a violation of § 18.2-57.2 . . . has occurred shall arrest and take into custody the person he has probable cause to believe, based on the totality of the circumstances, was the predominant physical aggressor unless there are special circumstances which would dictate a course of action other than an arrest.

15

Va. Code § 19.2-81.3.[6]   Of course, § 19.2-81.3, which does not address entry into private residences, does not abrogate the Constitution by dispensing with the exigency requirement for warrantless searches.   However, by commanding police officers to arrest for domestic assaults and batteries regardless of whether the offense was committed in their presence, it does, much like *Randolph*, evince a heightened concern for domestic violence.

The notion that § 19.2-81.3 could have contributed to a reasonable officer's calculation of whether an exigency was present in the circumstances confronted by Rigsby is buttressed by the Fourth Circuit's recent decision in *Trull v. Smolka*, 411 F. App'x 651 (4th Cir. 2011) (per curiam), where the court upheld the district court's dismissal of a § 1983 unlawful entry claim where the police, without consent, entered the residential bathroom of a man who was alleged to have battered his wife.[7]   The court stated that the need of the police officers to enter the bathroom to speak with the suspect was supported by Virginia law, and in so doing, the court explicitly cited § 19.2-81.3.   *Id.* at 656.   The court continued:

> The record does not show the officers had evidence of any violence at the scene. However, courts have recognized that domestic situations can escalate quickly: "[d]omestic disturbances have a low flash point, and 'violence may be lurking and explode with little warning.'"   *McCracken v. Commonwealth*, 39 Va. App. 254, 572 S.E.2d, 493, 496 (2002) (quoting *Fletcher v. Town of Clinton*, 196 F.3d 41, 50 (1st Cir. 1999)).   In *McCracken*, a case with facts vastly different than these, the court noted that Virginia Code section 19.2-81.3 created officer duties.   *Id.* at

---

[6] The Virginia General Assembly adopted the first iteration of § 19.2-81.3 in 1991.  1991 Va. Acts ch. 715 (H.B. 1991).  Initially, § 19.2-81.3 simply gave law enforcement officers discretion to make warrantless arrests in cases of assault and battery against a family or household member.  *Id.*   In 1996, the General Assembly authorized such warrantless arrests even if the violation was committed outside of the law enforcement officer's presence.  1996 Va. Acts ch. 866 (S.B. 113) (effective July 1, 1997).  In the same bill, upon the recommendation of the Commission on Family Violence Prevention, the General Assembly revised subsection (B) such that a law enforcement officer with probable cause to believe that a violation of § 18.2-57.2 has occurred "*shall* arrest and take into custody" the primary aggressor.  *Id.* (emphasis added); *Report of the Commission on Family Violence Prevention*, H. Doc. No. 50, at 9 (1996).

[7] I note that the facts of the case are distinguishable in certain regards from those of the instant case.  For instance, in *Trull*, the police officers were responding to a 911 call, the man's wife had consented to their entry into the home itself, and there was uncertainty about the presence of an antique firearm.  *Trull v. Smolka*, 411 F. App'x 651, 653 (4th Cir. 2011) (per curiam).  Nonetheless, *Trull* underscores the notion that, in the eyes of the Fourth Circuit, § 19.2-81.3 contributes to a police officer's exigency determination in potential domestic violence situations.

n.4 ("In recognition of the difficulty of protecting against domestic violence, the General Assembly increased the duties of law-enforcement officers when responding to such incidents," by enacting section 19.2-81.3).

*Id.* Therefore, although § 19.2-81.3 was not the only factor taken into account in *Trull*, the court nevertheless plainly found that provision of the Virginia Code relevant in its consideration of the police officers' warrantless entry in that case.

Notably, the Supreme Court has stated that the relevant question under the "clearly established" line of inquiry is "the objective (albeit fact-specific) question whether a reasonable officer could have believed [Rigsby's] warrantless search to be lawful, in light of clearly established law and the information [Rigsby] possessed." *Creighton*, 483 U.S. at 641. Ultimately, that question must be answered in the affirmative. When Rigsby made the decision to enter Ms. Pleasants's apartment, he was armed with the knowledge of the events that had transpired six weeks earlier. During the incident on November 1, 2009, Rigsby was exposed to the contentiousness of the Pleasants's struggle over K.P. Indeed, he was told then that Ms. Pleasants was going to throw K.P. out of her home, that Ms. Pleasants was "very violent," and that she may have been intoxicated. And on that day, he saw K.P. crying and distressed. On December 13, 2009, when he was asked to conduct a welfare check to ensure K.P.'s safety, he was informed that K.P. could be heard crying and screaming on the telephone. When he arrived at the apartment to check on K.P., he encountered an upset and hostile Ms. Pleasants who made it clear, by attempting to shut the door on him, that she was not going to let Rigsby ensure K.P.'s safety despite the fact that Rigsby could not see K.P. well enough to ascertain whether she was hurt. Upon consideration of the aforementioned facts, it is clear that an officer in Rigsby's shoes could have reasonably come to the conclusion that the circumstances amounted to an exigency justifying the warrantless entry of Ms. Pleasants's home. Put differently, at the time of Rigsby's actions on December 13, 2009, it was not clearly established that a police officer had to possess a

17

warrant in order to enter a private residence to ensure the safety of a hysterical child whose father was concerned about her and whose mother was potentially intoxicated and allegedly violent.

Ultimately, whether the circumstances objectively amounted to an exigency, and whether Rigsby violated Ms. Pleasants's Fourth Amendment right, are questions that I need not address in light of the fact that, under those circumstances, the right here was not clearly established. Thus, even if Rigsby made a mistake by entering without a warrant, he did so reasonably.[8] Accordingly, Rigsby is entitled to qualified immunity.  This outcome comports with the Supreme Court's instruction that qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law."  *Malley*, 475 U.S. at 341.  As the Fourth Circuit has aptly put it, qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'"  *Willingham*, 412 F.3d at 558 (quoting *Maciariello*, 973 F.2d at 298).  The relevant facts and case law here indicate that Rigsby did not transgress any such bright line.  While it is tempting for courts, aided by the benefit of hindsight, to second-guess a police officer's conduct, "it is also true that real harm to persons and property could result 'if police tried to act with the calm deliberation associated with the judicial process.'"  *Hunsberger*, 570 F.3d at 557 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)).

Because Rigsby is entitled to qualified immunity, I will grant his motion for summary judgment on Ms. Pleasants's unlawful entry claim.

---

[8] Because an inquiry into qualified immunity and an analysis of Fourth Amendment rights are both concerned with reasonableness, there is a significant amount of overlap between the two.  *See Hunsberger v. Wood*, 570 F.3d 546, 557 (4th Cir. 2009).  One might say that Rigsby acted "reasonably unreasonable," *Anderson v. Creighton*, 483 U.S. 635, 643 (1987), an outcome often created by the "clearly established" component of the qualified immunity inquiry, *see* Lisa R. Eskow & Kevin W. Cole, *The Unqualified Paradoxes of Qualified Immunity: Reasonably Mistaken Beliefs, Reasonably Unreasonable Conduct, and the Specter of Subjective Intent that Haunts Objective Legal Reasonableness*, 50 BAYLOR L. REV. 869, 878–79 (1998).

**2. False Arrest**

Ms. Pleasants brings a false arrest claim against Rigsby pursuant to § 1983, alleging that Rigsby lacked probable cause to arrest her on the basis of K.P.'s statements.[9]   An arrest is a seizure of the person, and, subject to limited exceptions not relevant here, Fourth Amendment seizures are reasonable only if based on probable cause.  *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003).  An officer has probable cause for arrest when "the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  To be sure, probable cause requires more than bare suspicion, but it is a flexible standard that need not amount to evidence necessary to convict.  *United States v. Ortiz*, --- F.3d ---, No. 11-4193, 2012 WL 604151, at *4 (4th Cir. Feb. 27, 2012); *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998).  "[W]hen it is considered in the light of all the surrounding circumstances, even 'seemingly innocent activity' may provide a basis for finding probable cause."  *Id.* (quoting *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996)).  Thus, Ms. Pleasants's ability to maintain her false arrest claim hinges on whether Rigsby had probable cause to arrest her, for "there is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause."  *Street v. Surdyka*, 492 F.2d 368, 372–73 (4th Cir. 1974).

---

[9] Briefly, I note that even if Rigsby's conduct violated Ms. Pleasants's Fourth Amendment right, and were he not entitled to qualified immunity, it is not the case that Rigsby is automatically liable in tort for his subsequent decision to place her under arrest.  There is no fruit of the poisonous tree doctrine in the § 1983 context that makes Rigsby necessarily liable for a seizure that came after a potentially unlawful search.  The fruit of the poisonous tree doctrine is merely an extension of the exclusionary rule, *see Segura v. United States*, 468 U.S. 796, 804 (1984), and as such generally operates "only in criminal trials."  *Pa. Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 364 n.4 (1998).  Consequently, "[v]ictims of unreasonable searches . . . may recover damages directly related to the invasion of their privacy . . . but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution."  *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999).  In short, even if Rigsby's entry was unlawful, that fact in itself would not preclude him from arguing that he had sufficient probable cause to arrest Ms. Pleasants such that her false arrest claim should be dismissed.  *See Guerrero v. Deane*, 750 F. Supp. 2d 631, 652 (E.D. Va. 2010) (noting, in a § 1983 case, that the lawfulness of an entry is a separate question from the lawfulness of a subsequent seizure).

In determining whether probable cause exists in a given case, the court must limit its consideration to only those facts and circumstances known to the officer at the time of the arrest. *See Wilson*, 337 F.3d at 398; *see also Gooden v. Howard County*, 954 F.2d 960, 965 (4th Cir. 1993) ("In cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place."). "It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker." *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991). Indeed, the Fourth Circuit has observed that "it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself." *Id.*; *see also McKinney v. Richland County Sheriff's Dep't*, 431 F.3d 415, 418 (4th Cir. 2005) (finding probable cause for an arrest based primarily on the victim's identification of her attacker).

As has already been described, Virginia law authorizes (and perhaps even requires) arrest without a warrant in cases of assault and battery against a family or household member in violation of Virginia Code § 18.2-57.2. Va. Code § 19.2-81.3(B). Significantly, the statute provides that a police officer "having probable cause to believe that a violation of § 18.2-57.2 . . . has occurred *shall arrest* and take into custody the person he has probable cause to believe, based on the totality of the circumstances, was the predominant physical aggressor." *Id.* (emphasis added). Whereas in other situations police officers in Virginia have discretion to make arrests for the commission of misdemeanors, the statute's pointed use of the word "shall" creates something akin to a duty to arrest for domestic assaults when officers have probable

cause to believe such assaults have occurred.[10]  Presumably, § 19.2-81.3 reflects concerns related to the volatile nature of domestic violence.

In light of these principles, Rigsby argues that K.P.'s statement of her mother's use of physical force against her provided him with probable cause to make the arrest.  There are no facts alleged that call into question the reasonableness of K.P.'s complaint.  Thus, if the child described an application of force that would constitute a crime in Virginia, then surely her statement to the officer supplied probable cause to make the arrest.  The primary question, then, is whether a mother slapping her child on the leg and grabbing her child by the wrist and ordering her to take a shower is sufficient to warrant a person of reasonable caution to believe that an assault and battery against a family member occurred.

In Virginia, statutory assault and battery offenses, including those under § 18.2-57.2, incorporate the common law crime of "assault and battery" without statutory modification or restriction.  *See Clark v. Commonwealth*, 279 Va. 636, 641, 691 S.E.2d 786, 788 (2010) (explaining that "because the elements of assault are not statutorily defined, this Court must apply the common law definition"); *Montague v. Commonwealth*, 278 Va. 532, 541, 684 S.E.2d 583, 588 (2009) (affirming conviction under § 18.2-57[11] and noting that "[a]ssault and battery are common law crimes").  It is clear from longstanding Virginia jurisprudence that a battery may be accomplished with the slightest touch.  "A battery is the unlawful touching of the person of another by the aggressor himself" and "[t]he law cannot draw the line between different degrees of force, and therefore totally prohibits the first and lowest stage of it."  *Lynch v.*

---

[10] In *McCracken v. Commonwealth*, the Court of Appeals of Virginia observed that § 19.2-81.3 creates police officer duties.  39 Va. App. 254, 261, 572 S.E.2d 493, 496 n.4 ("In recognition of the difficulty of protecting against domestic violence, the General Assembly increased the duties of law enforcement officers when responding to such incidents" by enacting § 19.2-81.3).  Whether § 19.2-81.3 creates legally enforceable or cognizable duties is not only a question that I decline to answer but also one better left to the sound judgment of the Supreme Court of Virginia.

[11] Section 18.2-57 of the Virginia Code is the general assault and battery statute.

*Commonwealth*, 131 Va. 762, 109 S.E. 427, 428 (1921) (citation omitted).  In short, assault and

battery is "the least touching of another, willfully or in anger."  *Perkins v. Commonwealth*, 31

Va. App. 326, 330, 523 S.E.2d 512, 513 (2000).  The touching need not result in injury to the

person; "'[i]t is sufficient if it does injury to the [victim's] mind or feelings.'"  *Parish v.*

*Commonwealth*, 56 Va. App. 324, 330, 693 S.E.2d 315, 318 (2010) (quoting *Wood v.*

*Commonwealth*, 149 Va. 401, 404, 140 S.E. 114, 115 (1927)).

  In the instant case, K.P.'s recounting of physical force used against her certainly satisfies

the requirement that there be a willful touching of another.  However, Ms. Pleasants argues that

the physical touching complained of here was permissible under Virginia law because it was

corporal punishment inflicted by a mother on her child.  To be sure, "parents or persons standing

in *loco parentis* may administer such reasonable and timely punishment as may be necessary to

correct faults in a growing child"; however, that right "cannot be used as a cloak for the exercise

of uncontrolled passion, and [a parent] may be criminally liable for assault and battery if he

inflicts corporal punishment which exceeds the bounds of due moderation."  *Harbaugh v.*

*Commonwealth*, 209 Va. 695, 697–98, 167 S.E.2d 329, 332 (1969) (citing *Carpenter v.*

*Commonwealth*, 186 Va. 851, 860, 44 S.E.2d 419, 423 (1947)).  "[W]here a question is raised as

to whether punishment is moderate or excessive, the fact is one for the jury to determine from the

attending circumstances, considering the age, size and conduct of the child, the nature of the

misconduct, and the kind of marks or wounds inflicted on the body of the child."  *Id.*  at 698, 167

S.E.2d at 332.  The vast majority of cases applying the due moderation standard are of little

guidance because they involve more severe applications of force than evidently took place here.

*See, e.g.*, *Harbaugh*, 209 Va. at 696, 167 S.E.2d at 331 (beating of five-year-old child caused

badly bruised buttocks with blood seepage and purple marks and welts on both legs such that the

outer layer of skin stuck to the child's underpants); *Carpenter*, 186 Va. at 855–56, 44 S.E.2d at 421 (beating of seven year-old child resulted in open and bleeding bruises across her entire body and a large bleeding gash on her face); *Ferguson v. Commonwealth*, 51 Va. App. 427, 431, 658 S.E.2d 692, 694 (2008) (child struck in head with telephone causing bleeding); *Guzman v. Commonwealth*, No. 2329-01-2, 2002 WL 1363562, at *2 (Va. Ct. App. June 25, 2002) (ten-year-old child smacked on face once or twice with a closed hand, causing a laceration in the corner of the boy's right eye, another upon his nose area, and a scrape on his right shin); *Campbell v. Commonwealth*, 12 Va. App. 476, 484, 405 S.E.2d 1, 5 (1991) (three-year-old child beat fifteen times with belt causing extensive bruising that required hospitalization); *Diehl v. Commonwealth*, 9 Va. App. 191, 193, 385 S.E.2d 228, 229–30 (1989) (child shackled to floor of bus and beaten on the head and body, causing death).  There is a paucity of case law applying the due moderation standard to less severe applications of force, thus providing little aid to officers like Rigsby who are faced with evidence of less egregious batteries.

Nevertheless, Ms. Pleasants asserts that no reasonable officer could possibly have believed that a mother would be prohibited from using the amount of physical coercion described here to discipline her daughter.  In so arguing, Ms. Pleasants misses the point.  The relevant question here is not whether a reasonable officer could have believed that the amount of force Ms. Pleasants applied to K.P. fell within the bounds of acceptable parental discipline (for that is a separate inquiry, reserved for a jury), but rather whether a reasonable officer could have believed that K.P.'s statements amounted to probable cause for an arrest pursuant to § 19.2-81.3. After reviewing the facts alleged by Ms. Pleasants, I conclude that a reasonable officer could have found sufficient evidence to support a determination that there was probable cause for arrest.  Although it is true that Rigsby observed no physical signs of abuse or trauma, K.P.'s

statements that her mother had slapped her and, with some apparent degree of force, snatched her by the wrists are in themselves sufficient to meet the common law definition of a battery, which requires only the willful touching of another.  *See Perkins*, 31 Va. App. at 330, 523 S.E.2d at 513.  Whether it was prudent for Rigsby to arrest Ms. Pleasants on the basis of K.P.'s statements is irrelevant for the purposes of Ms. Pleasants's false arrest claim because if there was probable cause to make the arrest, that claim cannot stand.

It would be unreasonable for purposes of the Fourth Amendment and improvident as a matter of public policy if police officers arrested parents for touching their children in *any* manner that might fall within the common law definition of assault and battery (such as, for example, holding an unruly child's hand while crossing a street).  However, the instant case does not raise this specter; it involved statements by a crying child that she had been slapped and grabbed with force.  Within the common law definition of assault and battery, such evidence is sufficient to form probable cause in a reasonable officer's mind that a violation of § 18.2-57.2 took place.  And in placing Ms. Pleasants under arrest, Rigsby simply endeavored to follow the long-standing command of the General Assembly that, armed with such probable cause, he "shall arrest" the predominant aggressor pursuant to § 19.2-81.3.[12]  In so doing, he acted within the bounds of the Fourth Amendment.  Therefore, I will grant Rigsby's motion to dismiss Ms. Pleasants's false arrest claim pursuant to § 1983.

---

[12] I note that "courts have consistently recognized that police officers may rely on the presumptive validity of statutes."  *Harrison v. Deane*, 426 F. App'x 175, 180–81 (4th Cir. 2011); *see also Pierson v. Ray*, 386 U.S. 547, 555–57 (1967) (recognizing that under § 1983, police officers who were sued for false arrest were entitled to a defense of "good faith and probable cause" based on their reasonable belief that the statute under which they acted was constitutional).  The Supreme Court has not explicitly ruled on the constitutionality of state statutes that permit warrantless arrests for misdemeanors committed outside the presence of police officers, *Atwater v. Lago Vista*, 532 U.S. 318, 340 n.11 (2001) (declining to reach this question), but precedent within this circuit finds that a warrantless arrest for a misdemeanor committed outside of the officer's presence does not violate the Fourth Amendment so long as there is probable cause to support the arrest.  *Shultz v. Smith*, 264 F. Supp. 2d 278, 280 (D. Md. 2003) (citing *Street v. Surdyka*, 492 F.2d 368, 371–72 (4th Cir. 1974)).

### 3. Malicious Prosecution

Ms. Pleasants claims that Rigsby is liable under § 1983 for malicious prosecution because he initiated a criminal prosecution of her that deprived her of rights protected by the Fourth Amendment.  Whether an independent cause of action for malicious prosecution under § 1983 even exists is a question that has, for quite some time, confounded the federal courts.  *See, e.g.*, *Wallace v. Kato*, 549 U.S. 384, 390 n.2 (2007) ("We have never explored the contours of a Fourth Amendment malicious-prosecution suit under § 1983, and we do not do so here.") (citation omitted).  Recently, in *Snider v. Seung Lee*, the Fourth Circuit undertook an effort to summarize its understanding of the law surrounding such a claim:

> While it is not entirely clear whether the Constitution recognizes a separate constitutional right to be free from malicious prosecution, *see Albright v. Oliver,* 510 U.S. 266, 279–80 n. 5, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring); *Lambert v. Williams,* 223 F.3d 257, 261–62 (4th Cir.2000), if there is such a right, the plaintiff must demonstrate both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure. In *Lambert* we explained:
>> Our analysis in *Brooks* [*v. City of Winston–Salem,* 85 F.3d 178 (4th Cir.1996) ], understood in light of these precedents, makes clear that there is no such thing as a " § 1983 malicious prosecution" claim. What we termed a "malicious prosecution" claim in *Brooks* is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution—specifically, the requirement that the prior proceeding terminate favorably to the plaintiff.
> 223 F.3d at 262.

584 F.3d 193, 199 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 2073 (2010).  Although the jurisprudence here may not be a model of clarity, what is clear is that a "malicious prosecution" claim under § 1983 requires the plaintiff to make allegations founded on a Fourth Amendment *seizure*.  And in order for a plaintiff to state a § 1983 malicious prosecution claim for a seizure violative of the Fourth Amendment, the law of this circuit requires that "the defendant have seized [plaintiff] pursuant to legal process that was not supported by probable cause and that the

criminal proceedings [have] terminated in [plaintiff's] favor." *Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir. 2005). Although malice is required to state a claim for malicious prosecution at common law, the reasonableness of a seizure under the Fourth Amendment should be analyzed objectively. *Id.* at 514 n.5.

Analyzing Ms. Pleasants's malicious prosecution claim under this framework, it is clear that she has failed to allege sufficient facts to state a claim. She has not alleged a Fourth Amendment *seizure* in this count; rather, she pins her claim on the fact that Rigsby, by arresting her, played a causal role in the initiation of a criminal prosecution against her (which was ultimately dropped). Of course, had Ms. Pleasants focused her allegations on Rigsby's warrantless seizure of her, the cause of action would likely have been dismissed all the same. First, such a claim would have been duplicative of her false arrest claim and dismissed for that reason. *See Medows v. City of Cayce*, No. 3:07-409, 2008 WL 2537131, at *3 (D.S.C. June 24, 2008) ("A claim that a *warrantless* arrest is not supported by probable cause constitutes a cause of action for false arrest as opposed to malicious prosecution."). Second, Ms. Pleasants cannot allege seizure *pursuant to legal process* because she was not initially arrested on a warrant or a summons. *See Burrell*, 395 F.3d at 514. Additionally, I note that to the extent Ms. Pleasants is alleging malicious prosecution for Rigsby's role in obtaining an arrest warrant subsequent to his arrest of Ms. Pleasants in her home, that claim fails as well. Such a claim would have to be dismissed because the seizure carried out by Rigsby occurred when Ms. Pleasants was arrested, not when the arrest warrant was issued by the magistrate. *See California v. Hodari D.*, 499 U.S. 621, 625 (1991) ("A seizure is a single act, and not a continuous fact."). Regardless of how Ms. Pleasants's § 1983 claim for malicious prosecution is parsed, it is clear that she has failed to state such a claim. Accordingly, it must be dismissed.

### 4. Failure to Train

In this count brought against the Town of Louisa pursuant to § 1983, Ms. Pleasants alleges that the town failed to "adequately and properly train [Officer] Rigsby on the law of probable cause, the elements of the offense of assault and battery on a family member and to distinguish between parental discipline and criminal behavior." Compl. ¶ 26. Ms. Pleasants alleges that Louisa's failure to train Rigsby "was a significant factor in causing the conduct" of which she complains. *Id.* Specifically, Ms. Pleasants alleges that Rigsby "had only a 'somewhat' [sic] understanding of parental disciplining" and had received only minimal training about this subject twelve and one-half years earlier at police academy training. *Id.* ¶ 15. Finally, Ms. Pleasants contends that by failing to discipline Rigsby after the incident or retrain him on the "law regarding parent-child dynamics as it relates to the criminal process," Louisa "acquiesced to the inadequate skills and training of [Officer] Rigsby and adopted his behavior as part of their policy and custom in domestic disputes involving children and their parents." *Id.* at ¶ 27.

In limited circumstances, a municipality like the Town of Louisa may be held liable under § 1983 for constitutional violations that result from its failure to train its municipal employees. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). However, such municipal liability can be based on inadequate training "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." *Id.* at 388. Only if, in light of the duties assigned to specific officers or employees, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," can a municipality "reasonably be said to have been deliberately indifferent to that need." *Id.* at 390. Therefore, "a plaintiff must point to a specific deficiency and not a general ineffectiveness of the training." *Semple v. City of Moundsville*, 195 F.3d 708,

27

713 (4th Cir. 1999).  In addition, a plaintiff must establish a direct causal connection between the specific deficiency identified and a specific constitutional injury.  *City of Canton*, 489 U.S. at 390–91.  Importantly, neither deficient training nor the required causal connection "can be shown by proof of a single incident of unconstitutional activity alone."  *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994).

However, in this cause of action, Ms. Pleasants points to only one incident of *unconstitutional* activity—namely, the allegedly false arrest.[13]  Not only is one isolated incident insufficient to make out a failure to train claim under § 1983, but it is also true that as a matter of law, Louisa cannot be held liable for a failure to train unless an underlying constitutional violation occurred.  *See S.P. v. City of Takoma Park*, 134 F.3d 260, 272 (4th Cir. 1998).  In this case, the supposed constitutional violation underlying Ms. Pleasants's failure to train claim is Rigsby's alleged false arrest of Ms. Pleasants for committing a battery that fell within the bounds of acceptable parental discipline.  As previously discussed in detail, however, Rigsby had probable cause to arrest Ms. Pleasants for that battery.  Accordingly, Ms. Pleasants cannot maintain her claim under § 1983 for false arrest, and if she has no basis for a cause of action in that regard, she necessarily cannot have a basis for her failure to train claim under § 1983.  Further, I agree with Louisa that Ms. Pleasants has not sufficiently pled a direct causal connection between the deficiency in training and the injury, but instead has asserted only that the failure to train was a "significant factor" in causing the injury.  In any event, Ms. Pleasants's

---

[13] Fairly construed, Ms. Pleasants's failure to train claim is focused on the underlying arrest and not the warrantless entry.  She alleges that the "failure" was a failure to properly train Rigsby on probable cause and on how to recognize acceptable forms of parental discipline.  Even if Ms. Pleasants had also alleged the unlawful entry as an underlying unconstitutional action, her cause of action would still be susceptible to the causation problem that I identify towards the end of this subsection.

failure to train claim under § 1983 is inadequate as it currently stands and must be dismissed.[14]

## B. State Common Law Claims

In addition to the foregoing claims brought pursuant to § 1983, Ms. Pleasants brings two related, supplemental state law claims against Rigsby.  The Court has discretion to exercise or decline jurisdiction over these claims.  28 U.S.C. § 1367; *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[Supplemental] jurisdiction is a doctrine of discretion, not of plaintiff's right.").  Taking into account the convenience of the parties, fairness, federalism concerns, the relatedness of the claims and issues, and considerations of judicial economy, I believe it best to exercise supplemental jurisdiction over Ms. Pleasants's state law claims.[15]

### 1. Malicious Prosecution

"Malicious prosecution actions arising from criminal proceedings are not favored in Virginia and the requirements for maintaining such actions are more stringent than those applied to other tort cases."  *O'Connor v. Tice*, 281 Va. 1, 7, 704 S.E.2d 572, 575 (2011).  Adhering to

---

[14] Louisa also observes that under the failure to train cause of action, Ms. Pleasants alleges that Louisa "adopted [Rigsby's] behavior as part of their policy and custom in domestic disputes involving children and their parents." Compl. ¶ 27.  Louisa argues that Ms. Pleasants should have stated whether she intended to assert a "policy and customs claim" separate from the failure to train claim.  By "policy and customs claim," Louisa is evidently referring to the theory of municipal liability that imposes damages "for the irresponsible failure by municipal policymakers to put a stop to or correct a widespread pattern of unconstitutional conduct by police officers of which the specific violation is simply an example."  *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir.1987).  Labeled a "custom or usage" theory by the Fourth Circuit, it is to be alleged in the alternative to—not subsumed under—a failure to train theory of liability.  *Id.* at 1389, 1391.  I agree with Louisa.  To the extent Ms. Pleasants intended to assert a "custom or usage" claim against the town, that claim is dismissed for failure to allege sufficient facts.

[15] Rigsby contends that he is immune from any state law tort claim based on a doctrine of state-law immunity that he describes as "good faith immunity."  Ms. Pleasants rejoins that good faith immunity, unlike qualified immunity, is an affirmative defense that should not be considered at the motion to dismiss stage.  "A defendant who asserts the qualified immunity defense, not the plaintiff, must allege and prove the elements comprising this defense," and the defendant may not shift his pleading and proof burdens to the plaintiff by way of a demurrer.  *Jordan v. Shands*, 255 Va. 492, 499, 500 S.E.2d 215, 219 (1998).  Indeed, the Fourth Circuit has unambiguously declared that federal qualified immunity is distinct from good faith immunity.  *Figg v. Schroeder*, 312 F.3d 625, 644 n.15 (4th Cir. 2002).  Good faith immunity, the court stated, is a defense that a police officer must allege and prove, and a plaintiff remains entitled to a jury determination of the officer's good faith and reasonable belief in the validity of the arrest.  *Id.*; *see also Dingus v. Moye*, No. 702CV00934, 2004 WL 34834, at *8 n.5 (W.D. Va. Jan. 5, 2004) ("Good faith immunity, however, requires the defendants to allege and prove both good faith and reasonableness.").  For these reasons, Ms. Pleasants is correct that the Court should not address the merits of the good faith immunity argument at this juncture.

more rigorous requirements in these cases helps "to ensure that criminal prosecutions are brought in appropriate cases without fear of reprisal by civil actions." *Lewis v. Kei*, 281 Va. 715, 723, 708 S.E.2d 884, 889 (2011).  In order to prevail in a malicious prosecution action, a plaintiff must demonstrate that "the prosecution was (1) malicious, (2) instituted by or with the cooperation of the [defendant], (3) without probable cause, and (4) terminated in a manner not unfavorable to [her].  *O'Connor*, 281 Va. at 7, 704 S.E.2d at 575.  Plainly, the second and fourth elements are not at issue in this suit.

Ms. Pleasants alleges that Rigsby acted maliciously because he lacked probable cause to arrest her and "[m]alice may be inferred from a lack of probable cause." *Reilly v. Shepherd*, 273 Va. 728, 733, 643 S.E.2d 216, 219 (2007).  As was discussed in great detail previously with respect to Ms. Pleasants's false arrest claim, a reasonable police officer standing in Rigsby's shoes could have determined that there was probable cause to arrest Ms. Pleasants based on the objective facts and circumstances known to him at the time, the most significant of which were of course K.P.'s statements regarding her mother's application of force.  Moreover, I point out that Ms. Pleasants's bald assertion that Rigsby lacked probable cause to arrest her is a legal conclusion because whether there is probable cause has long been acknowledged to be a question of law, s*ee Stewart v. Sonneborn*, 98 U.S. 187, 193–94 (1878), and legal conclusions in the guise of factual allegations are not entitled to a presumption of truth upon a motion to dismiss pursuant to Rule 12(b)(6), *see Iqbal*, 129 S. Ct. at 1950–51.  In the context of a malicious prosecution action under Virginia law, probable cause is defined as "knowledge of such a state of facts and circumstances as excite the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which [s]he is suspected." *Commissary Concepts Mgmt. Corp. v. Mziguir*, 267 Va. 586, 589–90, 594 S.E.2d 915, 917 (2004).

In viewing the facts alleged in the complaint as a whole under this definition, I cannot find that Ms. Pleasants has alleged facts sufficient to support her legal conclusion that Rigsby lacked probable cause to place her under arrest.  Ms. Pleasants's complaint makes it clear that Rigsby relied on K.P.'s statement in deciding that Ms. Pleasants had committed a battery in violation of Virginia Code § 18.2-57.2.  And "[i]t is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of h[er] attacker."  *Torchinsky*, 942 F.2d at 262.  As has been discussed, Rigsby had no reason to disbelieve K.P.'s statements, and Ms. Pleasants does not object to their veracity.  Therefore, I find that the facts known to Rigsby as alleged in Ms. Pleasants's complaint were sufficient to "excite the belief in a reasonable mind" that Ms. Pleasants had committed a domestic battery.  Accordingly, Ms. Pleasants's state law tort claim for malicious prosecution cannot stand and must be dismissed.

## 2. Gross Negligence

In its entirety, Ms. Pleasants's cause of action for gross negligence is alleged as follows: "The conduct of Defendant Rigsby as described herein constitutes gross negligence. . . .  As a direct and proximate cause of the aforesaid conduct of Defendant Rigsby, Plaintiff suffered and continues to suffer emotion [sic] distress and has incurred financial damages to defend against the prosecution and acquire therapy treatment."  Compl. ¶¶ 31–32.   To prove negligence, it is well-established that a plaintiff must show "the existence of a legal duty, a breach of the duty, and proximate causation resulting in damage."  *Atrium Unit Owners Ass'n v. King*, 266 Va. 288, 293, 585 S.E.2d 545, 548 (2003).   Gross negligence "is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person."   *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487, 603 S.E.2d 916, 918 (2004).   Put differently, it is a degree of negligence "that would shock fair-

minded persons, although demonstrating something less than willful recklessness." *Id.* As gross negligence is the "absence of slight diligence, or the want of even scant care," the exercise of "some degree of diligence and due care" by the defendant will defeat a claim of gross negligence. *Colby v. Boyden*, 241 Va. 125, 133, 400 S.E.2d 184, 189 (1991).

An examination of Ms. Pleasants's complaint reveals that she has failed to allege that Rigsby owed her any duty, that he breached any such duty, or that he acted with "indifference" or an "utter disregard of prudence." *Cowan*, 268 Va. at 487, 603 S.E.2d at 918. Moreover, the complaint is completely devoid of any factual allegations (or inferences) that Rigsby neglected Ms. Pleasants's safety or declined to employ due care to an extent that would "shock fair-minded persons." *Id.* Consequently, Ms. Pleasants's cause of action for gross negligence must also be dismissed.

## IV. CONCLUSION

For the reasons stated herein, Defendants' renewed motion to dismiss shall be granted and Plaintiff's complaint will be dismissed.[16]   An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this ___12th___ day of March, 2012.

_Norman K. Moon_
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[16] Defendants' renewed motion to dismiss incorporates the arguments set forth in their original motion to dismiss, which will be denied as moot.