# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| **SLOAN PLEASANTS,** *Plaintiff,* | ) ) ) |
| v. | ) **CASE NO. 3:11-CV-00032** ) ) **MEMORANDUM OPINION** |
| **TOWN OF LOUISA and ROBERT RIGSBY,** *Defendants.* | ) ) ) |

Plaintiff Sloan Pleasants ("Plaintiff") brings a claim under 42 U.S.C. § 1983 alleging a violation of the Fourth Amendment on the theory of false arrest. This matter is before the Court upon cross-motions for summary judgment filed by Plaintiff and Defendant Robert Rigsby ("Defendant"). For the reasons that follow, I will deny Plaintiff's motion and grant Defendant's motion.

## I.

### A. Factual Background

Plaintiff is a resident of the Town of Louisa, Virginia. Defendant is a police officer employed by the Louisa Police Department.

On November 1, 2009.[1] Defendant was dispatched to meet with Richard Kevin Pleasants ("Mr. Pleasants"), the estranged husband of Ms. Pleasants, at the Louisa Volunteer Fire Department, which is located on the same street as Plaintiff's apartment. Mr. Pleasants had concerns about his daughter K.P., and Defendant stated that Mr. Pleasants told him that, while on a telephone call with Plaintiff, "[h]e heard his daughter in the background crying and screaming, and he was concerned about her. And his ex-wife wouldn't let him talk to her." Def.'s Reply Br. Ex. A 25:19-22. He also noted that he "remember[ed] Kevin telling [him] about [Plaintiff's]

---

[1] According to his deposition testimony, Defendant did not know Mr. Pleasants or Plaintiff prior to November 1, 2009.

drinking." *Id.* at 56:7-8. Mr. Pleasants told Defendant that Plaintiff was throwing K.P. out of the apartment. Def.'s Summ. J. Br. Ex. B 12:16-22. He also asked Defendant to accompany him to pick up his daughter because Plaintiff had previously accused him of intimidating her. *Id.* at 18:8-15.

Mr. Pleasants arrived at Plaintiff's apartment and knocked on the door. Defendant stood back, at the end of the sidewalk. According to Plaintiff, she opened the door, conversed with Mr. Pleasants, stated that K.P. was not going, and then slammed the door shut. Pl.'s Resp. Br. Ex. C 13:12-25. Shortly thereafter, K.P. opened the door on her own, knowing that her father was outside, and told her mother that she wanted to leave. Def.'s Summ. J. Br. Ex. A 13:23-14:13. Ultimately, K.P. willingly left with Mr. Pleasants. Although Mr. Pleasants did not obtain her explicit permission, Plaintiff indicated through her actions that she acquiesced to K.P. leaving with Mr. Pleasants. *Id.* at 18:6-21. Throughout these events, Defendant remained at the end of the sidewalk, and did not communicate with Plaintiff or K.P.

At some point after this incident, Defendant was contacted by Mr. Pleasants about an upcoming court case related to the alleged unlawful taking of K.P. on November 1, 2009. Defendant ended up receiving a subpoena for this court case.

A second encounter between Plaintiff and Defendant occurred on December 13, 2009, after Mr. Pleasants returned K.P. to her mother following a weekend visitation. Pl.'s Summ. J. Br. Ex. A 23:9-24. K.P. called her father despite having just spent the weekend with him, but he missed the call. Def.'s Summ. J. Br. Ex. A 32:1-25. When he called back, there is some dispute as to whether Mr. Pleasants spoke with Plaintiff or K.P. directly, but there is no dispute that K.P. was "crying and bawling," that Mr. Pleasants heard this, and that he ultimately relayed K.P.'s crying and bawling to Defendant. *Compare* Pl.'s Resp. Br. Ex. B 61:8-62:1 *with* Pl.'s Resp. Br.

Ex. D 62:12-20. Defendant was again dispatched to perform a welfare check on K.P. Def.'s Summ. J. Br. Ex. B 23:22-24:14. According to Defendant, police officers in his department are routinely dispatched to conduct welfare checks on a variety of citizens upon the request of concerned family members. Defendant stated that he was informed by Mr. Pleasants that "[Mr. Pleasants] was going through a heated custody battle with his ex-wife." Def.'s Reply Br. Ex. A 59:23-24. During his deposition, Defendant was asked about his concerns that night:

> Q: Was there something that [Mr.] Pleasants told you that caused you any alarm?
> A: That his daughter was crying and screaming in the background and that she was - - apparently wanted to talk to her father, and her mother was not letting her.
> Q: And did that signal to you some potential for unlawful activity?
> A: Didn't signal to me of an unlawful activity but definitely of probable cause for investigation of an alarm.

Def.'s Summ. J. Br. Ex. B 26:25-27:10. Defendant further testified:

> Q: When you - - keeping in mind, then, that you were looking to do a welfare check, what were you going to be looking for?
> A: That the child was not in distress, that the child hadn't been injured, the child was being taken care of. The statements of the information that I received about the child crying, screaming in the background, whether the child was being hurt or had been hurt.

*Id.* at 29:4–12.

When Defendant and Mr. Pleasants arrived at Plaintiff's apartment, Mr. Pleasants knocked on the door. When Plaintiff opened the door, Defendant was standing a couple of feet behind Mr. Pleasants, who was standing at the doorstep. According to Plaintiff, as soon as she opened the door and saw them, she said "[y]ou can't keep doing this every weekend." Pl.'s Summ. J. Br. Ex. B 30:2-14. She pointed at Mr. Pleasants and Defendant and said, "You and you, get off my property." Def.'s Summ. J. Br. Ex. A 25:20-26:1. Mr. Pleasants said, "I want to see K.P. or speak to K.P." *Id.* at 27:21-29:4. Plaintiff responded that K.P. was "right there" inside the doorway and that "she's fine." *Id.* Plaintiff began to shut the door, at which point Defendant

"came through the door." *Id.* at 29:8-16.

Defendant observed that K.P. was "crying, upset, and appeared to be somewhat distressed, shook up, possibly in trauma" and "bashful and shy toward her mom that she was hesitant to come toward the doorway where her mom was." Def.'s Reply Br. Ex. F 52:13-22.[2] Defendant questioned K.P. about what had happened between Plaintiff and her that night, and Plaintiff interrupted and "piped up to talk," but Defendant silenced her by telling her that he was questioning K.P. Def.'s Summ. J. Br. Ex. G 44:20-45:3. K.P. stated "[m]y mom and I got in a fight" and said "[m]y mom hit me" and gestured that Plaintiff hit her with an open hand on her arm and leg. *Id.* at 45:2-6; 46:2-10; 50:3-8. K.P. also informed Defendant that "[Plaintiff] grabbed her by the wrist to pull her out of the floor." *Id.* at 46:18-22; 51:3-7. K.P. told Defendant that Plaintiff grabbed her by her arms or wrist telling her to take a shower, but that she jerked away and fell back into the chair. Pl.'s Resp. Br. Ex. F 48:7-16. Defendant did not testify in his deposition that he saw any welts, bruising, blood, or other indicia of physical injury to K.P. Pl.'s Summ. J. Br. Ex. B 38:11-17.

Defendant then arrested Plaintiff for assault and battery against a family member pursuant to Virginia Code § 18.2-57.2. In explaining his rationale behind the arrest, Defendant stated:

> Q: I just want the fact you relied on in deciding to arrest Ms. Pleasants.
> A: The facts, like I tried to explain, was the November 1st of going there, and I stood back and watched as [K.P.] was inside the residence crying, obviously upset, distressed. That was the first incident.
> The second incident of returning again on December 13th, 2009 of handling the second occurrence of going back, the crying, upset, appeared to be somewhat distressed, shook up, possibly in trauma. And then from

---

[2] Plaintiff does not dispute K.P.'s demeanor on the night of December 13 but does state that "Defendant Rigsby had seen K.P. crying, distressed and upset when he was at the residence in November, yet there was no indication that she had been touched no less subject to a battery" at that time. Pl.'s Resp. Br. 4. For the purpose of establishing the facts as Defendant observed them, this response helps establish that K.P.'s demeanor was in fact as Defendant described it in his deposition.

> finally speaking with her and getting her to come over to me, she also appeared to be kind of bashful and shy toward her mom that she was hesitant to come toward the doorway where her mom was, that she appeared to be, you know – she appeared to be withdrawn, and as speaking with her and she made the comment that her mom had hit her, and I continued to question her further, and it was that her mom had grabbed her by her wrist and jerked her up, yanked her up out of a chair. It was a continuously progressing on occurrences, and with facts that it didn't really feel that Sloan was disciplining her child for something . . .
>
> Then the incident at the house where she told her to go take a shower, a bath, and her mother grabs her by her arms and jerks her up out of a chair. You know, obviously it was continuously progressing, and it was my concern that what was next if I would have left the young lady there.

Def.'s Summ. J. Br. Ex. H 52:1-53:23. Ultimately, the Commonwealth Attorney moved to drop the charges against Plaintiff. Pl.'s Compl. ¶ 18.

### B. Legal Background

On April 26, 2011, Plaintiff filed a complaint, bringing three claims against Defendant under 42 U.S.C. § 1983, alleging violations of the Fourth Amendment on theories of false arrest (Count I), unlawful entry (Count II), and malicious prosecution (Count III). Ms. Pleasants simultaneously sued the Town of Louisa for failure to train under § 1983 (Count IV). Finally, Virginia state law claims were alleged by Plaintiff against Defendant for malicious prosecution (Count V) and gross negligence (Count VI). The complaint stated that K.P. had said "that Plaintiff slapped her on her leg where her arm was resting. Plaintiff's daughter also told Defendant that her mother grabbed her by her wrist and told her to take a shower." Pl.'s Compl. ¶ 12. It also stated that "Defendant Rigsby saw no welts or other indicia of even a mild or minor physical injury." *Id.* at ¶ 13. These two paragraphs constitute the entirety of the complaint's allegations about the night in question.

On March 12, 2012, I issued a memorandum opinion and order granting Defendant's motion to dismiss in its entirety. Previously I had allowed for some limited discovery on

Plaintiff's unlawful entry claim, and in the opinion I decided the unlawful entry claim as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, whereas I dismissed the rest of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff appealed, and on May 7, 2013, the United States Court of Appeals for the Fourth Circuit issued an opinion reversing in part. The Fourth Circuit specifically noted that "[u]nlike the unlawful-entry claim, the district court dismissed [the false arrest claim] pursuant to Federal Rule of Civil Procedure 12(b)(6), looking only at the allegations in the complaint."[3] *Pleasants v. Town of Louisa*, 524 Fed. Appx. 891, 896-97 (4th Cir. 2013). Based solely on the allegations in paragraphs twelve and thirteen of the complaint, the Fourth Circuit held that Plaintiff had stated a claim for false arrest, and remanded the case.

The parties' cross motions for judgment have been fully briefed and heard, and I now decide the motions and consider the false arrest claim in light of the entire summary judgment record.

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment (or partial summary judgment) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute

---

[3] During the February 19, 2014 hearing on the cross-motions for summary judgment, counsel for Plaintiff repeatedly argued that the facts available in the summary judgment record were available to the United States Court of Appeals for the Fourth Circuit when they issued their opinion and that the Fourth Circuit nevertheless found that Plaintiff had successfully stated a claim for false arrest. The implication of Plaintiff's argument was that all of the evidence available in the summary judgment record, which Defendant now relies upon, was already considered and rejected by the Fourth Circuit. This argument is, at best, a complete misunderstanding of the Fourth Circuit's opinion, which specifically noted that although the discovery had been conducted at the time of their opinion, they were constrained *not* to analyze the record because of the procedural posture through which they were analyzing the false arrest claim.

about a material fact must be " 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. *See also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

A court must grant a motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact."). If the proffered evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Anderson*, 477 U.S. at 242). The trial judge has an "affirmative obligation" to "prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* (quoting *Celotex*, 477 U.S. at 317).

## III.

I find that Defendant is entitled to qualified immunity. Qualified immunity applies regardless of whether the government official's alleged error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223,

231 (2009). Qualified immunity is designed to provide a safe harbor from liability to ensure that officers will be held liable only for transgressing bright lines and not for making "bad guesses in grey areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). In determining whether officers are entitled to qualified immunity, the Court assesses whether the officer's conduct was reasonable under the circumstances known to the officer at the time of the complained of actions. *Hunsberger v. Wood*, 570 F.3d 546, 555 (4th Cir. 2009). If the officer's conduct does not violate a constitutional right, qualified immunity applies and bars suit. *Pearson*, 555 U.S. at 232. Even if there is a question as to whether a Plaintiff's constitutional rights have been violated, however, qualified immunity still applies unless the "official's conduct violated a clearly established constitutional right." *Id.* It is within the discretion of the district court to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

An arrest is a seizure of the person, and, subject to limited exceptions, Fourth Amendment seizures are reasonable only if based on probable cause. *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003). An officer has probable cause for arrest when "the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Thus, in determining whether Plaintiff's constitutional rights were violated at all, the question depends, in part, on whether Defendant had probable cause to arrest her, because "there is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause." *Street v. Surdyka*, 492 F.2d 368, 372-73 (4th Cir. 1974).

However, I ultimately do not need to reach the question of whether Defendant had

probable cause to arrest. I exercise my discretion to analyze the second prong of the qualified immunity test first, focusing instead on whether Defendant's "conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232. While it is clearly established that probable cause is required to justify an arrest, *see Wilson*, 337 F.3d at 398, and that parents have a right to administer some discipline to their children, *see Carpenter v. Commonwealth*, 186 Va. 851, 44 S.E.2d 419, 424 (1947), the second prong of the qualified immunity inquiry is not answered merely by establishing that the doctrine, as a general matter, is clearly established. Instead, "the relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [his actions] to be lawful, in light of clearly established law *and the information the searching officers possessed*." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (emphasis added).

Under Virginia law, statutory assault and battery offenses under Virginia Code § 18.2-57.2 incorporate the common law crime of "assault and battery." *Clark v. Commonwealth*, 279 Va. 636, 691 S.E.2d 786, 789 (2010) (explaining that "because the elements of assault are not statutorily defined, this Court must apply the common law definition"). Furthermore, longstanding Virginia jurisprudence shows that battery may be accomplished with the slightest touch. *See, e.g., Perkins v. Commonwealth*, 523 S.E.2d 512, 513 (Va. Ct. App. 2000) ("Assault and battery is the 'least touching of another, willfully or in anger'") (citation omitted); *Lynch v. Commonwealth*, 131 Va. 762, 109 S.E. 427, 428 (1921) ("[t]he law cannot draw the line between different degrees of force, and therefore totally prohibits the first and lowest stage of it."). Additionally, in the case of assault and battery against a family member, a police officer in Virginia, "having probable cause to believe that a violation of § 18.2-57.2 . . . has occurred, shall arrest and take into custody the person he has probable cause to believe, based on the totality of

the circumstances, was the predominant physical aggressor." Virginia Code § 19.2-81.3(B).

On the other hand, Virginia has long recognized that a parent "has the right to administer such reasonable and timely punishment as may be necessary to correct faults in his growing children." *Carpenter*, 44 S.E.2d at 424; *see also Harbaugh v. Commonwealth*, 209 Va. 695, 167 S.E.2d 329, 331-332 (1969) (citing *Carpenter* with approval and noting that a "parent may use physical punishment with children so long as it is not 'a cloak for the exercise of uncontrolled passion . . . or corporal punishment which exceeds the bounds of due moderation.'"). The right to discipline children has long been a feature of the common law. *See* 1 W. Blackstone, *Commentaries on the Laws of England*, 440 (Oxford Reprint, 1966) (noting the common law rule of England that the parent "may lawfully correct his child, being under age, in a reasonable manner, for this is for the benefit of his education.").

The conflict between these laws is evident, as officers have a responsibility to follow the commands of the General Assembly and protect the safety and welfare of children but must also be sensitive to the surrounding circumstances, because "the application of *de minimus* force by a parent does not automatically create probable cause for arrest." *Pleasants v. Town of Louisa*, 524 F. App'x. 891, 898 (4th Cir. 2013). Thus, the controlling question becomes whether an objective officer in Defendant's position could have reasonably believed, given the circumstances known at the time, that arresting Plaintiff was supported by probable cause and thus mandated by Virginia Code § 19.2-81.3(B). If so, Defendant is entitled to qualified immunity. Conversely, Defendant is not entitled to qualified immunity only if no reasonable police officer would have concluded that Plaintiff's actions were anything but acceptable parental discipline.

Plaintiff's argument essentially focuses on the amount of contact between Plaintiff and K.P. in this case, asserting that "[a]ny reasonable person would . . . recognize that a slap on the

knee (or arm) of a child while she is yelling at her mother who is driving a car and later an effort to pick up the child to take a shower, neither of which caused any marks . . . is within the bounds of moderation." *Id.* at 12-13. Plaintiff asserts that this kind of contact "is the quintessential kind of physical contact that parents must engage in if they are to properly care for their child." *Id.* at 13. But Plaintiff misunderstands the proper inquiry. The test under this prong of the qualified immunity analysis is not whether any reasonable officer would conclude that the contact as described in the complaint is acceptable parental discipline, and it is certainly not some kind of inquiry into the proper way to care for children. It is rather whether a reasonable officer, armed with not just the complaint's description of the physical contact but with the background information not recorded in the complaint,[4] could have reasonably believed there to be probable cause to arrest Plaintiff for committing assault or battery against a family member in violation of Virginia Code § 19.2-81.3(B).

The summary judgment record discloses numerous reasons why Defendant may have been concerned about K.P. that are not present in Plaintiff's brief description from the complaint. On November 1, 2009, Defendant performed a welfare check on K.P. after having been informed that K.P. was "crying and screaming" on the phone and that Plaintiff had a problem with "drinking." Def.'s Reply Br. Ex. A 25:19-22; 56:7-8. On December 13, 2009, Defendant was again asked to perform a welfare check for the same child, once again hearing that she had been crying and bawling on the phone. Pl.'s Resp. Br. Ex. D 62:12-20. When Defendant saw K.P. that night, she appeared "crying, upset, . . . distressed, shook up, possibly in trauma," confirming to

---

[4] Plaintiff argues that "on the facts of this case, as recognized by the Fourth Circuit, it is apparent that the physical contact employed was not excessive." Pl.'s Resp. Br. 13. Although it belabors the point to again observe that Plaintiff draws unwarranted conclusions from the Fourth Circuit's opinion, I note that the Fourth Circuit stated that "*[a]t this stage* Pleasants has pled a *plausible* claim." *Pleasants v. Town of Louisa*, 524 F. App'x. 891, 898 (4th Cir. 2013) (emphasis added). The Fourth Circuit was referencing the motion to dismiss phase, and it in fact specifically observed that this view might be reevaluated "in light of [a] more developed factual record." *Id.* at 898 n. 6. Plaintiff's repeated reliance on the fact that the complaint stated a plausible false arrest claim is therefore of no help in analyzing that claim with the benefit of the much more thorough summary judgment record.

him that there was a problem. Def.'s Reply Br. Ex. F 52:13-22. Defendant also observed that K.P. was "bashful and shy toward her mom . . . [and] hesitant to come toward the doorway where her mom was." *Id.* When Defendant arrived to the house, Plaintiff told him to leave her property and attempted to close the door without allowing Defendant to see K.P. at all. Def.'s Summ. J. Br. Ex. A 25:20-26:1; 27:21-29:4. When Defendant later tried to question K.P., Plaintiff herself stated that she interrupted and "piped up to talk." Def.'s Summ. J. Br. Ex. G 44:20-45:3. When Defendant did manage to question K.P., she told him that "[m]y mom and I got in a fight" and "[m]y mom hit me." *Id.* at 45:2-6; 46:2-10. K.P. also explained that her mother grabbed her by her wrist, and that she jerked away and fell back into a chair. Pl.'s Resp. Br. Ex. F 48:7-16. The totality of the circumstances presented an escalating situation that needed to be defused, and a reasonable officer could have believed under these circumstances that Plaintiff had administered "corporal punishment which exceeds the bounds of moderation." *Harbaugh*, 167 S.E.2d at 331-332.

This background context creates a very different scenario than the one described in Plaintiff's complaint, where K.P. "stated that Plaintiff had slapped her on her leg where her arm was resting" and that "her mother grabbed her by her wrist and told her to take a shower." Pl.'s Compl. ¶ 12. The entire story, according to Plaintiff's complaint, was that Plaintiff tapped her daughter on her leg and encouraged her to take a shower. Absent from the complaint was the evidence obtained during discovery that Defendant had been told more than once that K.P. was crying and screaming while staying with her mother, and that K.P. appeared to not only be upset but hesitant to go near her mother when Defendant saw her in person, which could reasonably indicate both that Mr. Pleasants's reports about K.P.'s distress were accurate and that they were tied somehow to Plaintiff. The summary judgment record further reveals not only that Plaintiff

attempted to prevent Defendant from seeing her daughter or speaking to her on the phone but also that she attempted to talk over K.P. when Defendant was able to speak with her. An officer who had been asked to investigate the welfare of a distraught child twice in six weeks, and observed multiple efforts to prevent dialogue between himself and that child, could reasonably perceive those actions as the kind of steps an abusive authority figure would take to keep their child from speaking out against them.

Finally, the statement "my mom hit me" is much more serious than the slap on the leg the complaint describes, and being jerked up by the wrist hard enough to be capable of tumbling back down into a chair is similarly very different from simply being grabbed by the wrist and being told to shower. Plaintiff suggests that K.P. went on to explain that she meant an argument when she said "fight," and generally argues that K.P. explained that her statements were not as alarming as they sound. Pl.'s Resp. Br. 3-4. But even accepting this as true, a reasonable officer could easily perceive that a cowed child would backpedal and try to explain away a statement like "my mom hit me" to appease a nearby guardian of whom she was frightened.

In short, the summary judgment record presents a picture of an officer who could reasonably perceive a situation involving a frightened child, a mother preventing that child from speaking to the police, and allegations of violence more serious than the light contact described in the complaint. Based on that perception of events, it would be reasonable to believe that Plaintiff was acting in "the exercise of uncontrolled passion," *see Harbaugh*, 161 S.E.2d at 331-332 (1969), and not simply exercising "the right to administer such reasonable and timely punishment as may be necessary to correct faults in his growing children." *Carpenter*, 44 S.E.2d at 424. An officer could reasonably believe that Plaintiff's actions were something other than loving and appropriate parental discipline, given that K.P. had been screaming and crying

[13]

numerous times, that Plaintiff appeared intent on preventing Defendant from speaking to K.P., and that K.P. described the contact between herself and Plaintiff to Defendant with fairly strong language.[5]

An officer in Defendant's position is forced to be the outside observer in a "heated custody battle," where the potential is high for both abusive behavior (which the officer must recognize and prevent) and misrepresentations (which the officer must see through). Def.'s Reply Br. Ex. A 59:23-24. That officer must gauge the situation according to the facts at hand and determine whether probable cause to arrest exists. When a court analyzes the behavior of an officer, it must simply determine "whether a reasonable officer could have believed [his actions] to be lawful, in light of clearly established law and the information the searching officers possessed." *Anderson*, 483 U.S. at 641. After carefully examining the summary judgment record, I conclude that a reasonable officer could have found probable cause to believe that a violation of Virginia Code § 18.2-57.2 had occurred, and thus reasonably believed that the action of arresting Plaintiff was lawful and indeed mandated by Virginia Code § 19.2-81.3(B). Accordingly, regardless of whether probable cause in fact existed for the arrest, I find that Defendant is entitled to qualified immunity. To hold Defendant liable would be to defeat the purpose of qualified immunity, which is to shield officials acting in their official capacity from civil liability for "bad guesses in grey areas." *Maciariello*, 973 F.2d at 298. In other words, even if Defendant was wrong about whether he had probable cause to arrest, it was not unreasonable for him to believe that he did given the clearly established law and information available to him at the time

---

[5] Of course, alternative explanations could also be formulated. An officer might have believed, for instance, that K.P. was acting out because she was trying to ensure she got more time with her father, and that Plaintiff was aggravated because she perceived that Mr. Pleasants was bringing Defendant with him in an effort to harass her. But, as Plaintiff acknowledges, the question when considering the application of qualified immunity is not the best interpretation of the evidence after the fact, but rather whether "no reasonable police officer" would have agreed with Defendant's evaluation of the situation at the time and given the evidence. Pl.'s Resp. Br. 9.

of arrest. *Anderson*, 483 U.S. at 641.

## IV.

Because I find that Defendant is entitled to qualified immunity, Defendant's motion for summary judgment will be granted and Plaintiff's motion for summary judgment will be denied. An appropriate order follows.

Entered this  18th  day of March, 2014.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE